A. SASHA FRID (State Bar No. 216800)
sfrid@millerbarondess.com
CHRISTOPHER D. BEATTY (State Bar No. 266466)
cbeatty@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:   (310) 552-8400

Attorneys for Defendants and Counterclaimants
UMG RECORDINGS, INC. and UNIVERSAL
MUSIC GROUP DISTRIBUTION CORP.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERTO DIAZ MORENO<br><br>Plaintiff,<br><br>v.<br><br>UMG RECORDINGS, INC.; UNIVERSAL MUSIC GROUP DISTRIBUTION CORP.; and DOES 1 to 5,<br><br>Defendants.<br>_____<br>UMG RECORDINGS, INC. and UNIVERSAL MUSIC GROUP DISTRIBUTION CORP.,<br><br>Counterclaimants,<br><br>v.<br><br>GILBERTO DIAZ MORENO,<br><br>Counterclaim Defendant. | **CASE NO. CV 13-02879-SVW (PLAx)**<br><br>[Assigned to the Honorable Stephen V. Wilson]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     April 21, 2014<br>Time:    1:30 p.m.<br>Ctrm.:    6<br><br>[*Notice of Motion; Statement of Uncontroverted Facts and Conclusions of Law; Declarations of A. Sasha Frid and Mark Berger; and (Proposed) Order filed concurrently herewith*]<br><br>Action Filed:  April 24, 2013<br>Trial Date:     May 6, 2014 |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS ............................................................................. 2

    A. Aliados De La Sierra ........................................................................... 2

    B. Artist Representation Agreements ...................................................... 2

    C. Record Company Agreements ............................................................ 2

    D. Trademark Application ....................................................................... 3

III. LEGAL STANDARD .................................................................................... 4

IV. ARGUMENT .................................................................................................. 4

    A. This Court Can And Should Cancel Diaz's Trademark At The Summary Judgment Stage. ................................................................. 4

    B. The Submission of a Misleading Specimen to the PTO Constitutes Fraud. ............................................................................... 5

    C. Failure To Inform The PTO Of The Established Rights Of Others To Use The Trademark Is Fraud. ........................................... 6

    D. Diaz's False Statements About Using CDs In Commerce On Or Before March 28, 2007 Consitute Fraud. ........................................... 7

    E. Diaz's Fraudulent Statements About Using CDs In Commerce Present An Independent Ground For Cancelling A Mark .................. 8

V. CONCLUSION ............................................................................................... 9

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,
    522 F.3d 1200 (11th Cir. 2008) ................................................................. 4, 7

*City of New York v. Tavern on the Green, L.P.*,
    427 B.R. 233 (S.D.N.Y. 2010) ................................................................... 7, 8

*Herbaceuticals, Inc. v. Xel Herbaceuticals*,
    2008 WL 618625 (TTAB 2008) ..................................................................... 8

*Melodrama Pub., LLC v. Santiago*,
    2013 WL 1700929 (S.D.N.Y. Apr. 11, 2013) ............................................. 5, 9

*Robi v. Five Platters, Inc.*,
    918 F.2d 1439 (9th Cir. 1990) ........................................................ 1, 4, 5, 6, 7

*Senger v. United States*,
    103 F.3d 1437 (9th Cir. 1996) ......................................................................... 4

*Top Producer Sys. Inc. v. Software Sciences Ltd.*,
    1997 WL 723049 (D. Or. July 21, 1997) ........................................................ 4

## **STATUTES**

15 U.S.C. § 1064 .................................................................................................. 1, 4, 9

15 U.S.C. §1119 ........................................................................................................ 4

Fed. R. Civ. P. 56 ...................................................................................................... 4

## **OTHER AUTHORITIES**

PTO Rule §2.56. ........................................................................................................ 5

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Gilberto Diaz Moreno ("Diaz") is seeking to collect royalties from UMG Recordings, Inc. and Universal Music Group Distribution Corp. (collectively, "UMG") for album sales of the band Aliados De La Sierra. But there is not a single agreement that entitles him to any royalties.

In order to conjure up a claim against UMG, Diaz obtained a trademark for the Aliados De La Sierra name. To obtain this trademark, Diaz made false submissions to the Patent and Trademark Office ("PTO"), including a false specimen, false declaration, false statement of use, and false first date of use. Each of these submissions independently warrants the cancellation of the trademark. When considered collectively, the evidence in favor of cancellation is overwhelming.

Armed with his fraudulently obtained trademark, Diaz sued UMG to collect the royalties he believes he is owed. Although he has brought various claims under the Lanham Act, the underlying allegations are the same: here is a piece of paper from the federal government stating that I own a trademark in Class 9 for Pre-recorded CDs featuring musical compilations. Because I have this trademark, you owe me royalties for the sales of Aliados De La Sierra CDs.

Diaz's claims fail. UMG is concurrently filing a motion for summary judgment to dismiss Diaz's lawsuit.

UMG filed a counterclaim against Diaz to cancel Diaz's trademark. The claim is straightforward: as a matter of law, "[a] party may seek cancellation of a registered trademark on the basis of fraud under 15 U.S.C. § 1064[(3)]." *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990). Diaz should no longer be allowed to trumpet his ownership of this fraudulently obtained trademark.

For the foregoing reasons, UMG respectfully requests that this Court grant judgment on its counterclaim.

## II. STATEMENT OF FACTS

### A. Aliados De La Sierra

Aliados De La Sierra is a Latin music group that played in the Latin music genre. Statement of Uncontroverted Facts and Conclusions of Law ("SUF") 1. The six founding members of the band were: Sergio Federico, Eduardo Navar Cano, Pedro Celis Rosales, Roberto Tello, Jose Luis Muro Ortiz and Adan Cervantes Carrera. SUF 2. The band was formed in 2007. SUF 3.

The band had two representatives: Diaz and Serrano. SUF 4. Serrano is a Mexican-based manager with Latin Power Music, a company specializing in managing Latin musical acts.[1] SUF 5.

### B. Artist Representation Agreements

On March 31, 2007, the six band members entered into identical artist representation agreements that formalized the band's relationship with its two representatives, Diaz and Serrano (the "Artist Agreements"). SUF 8. Both Diaz and Serrano were referred to as "representatives." SUF 9. These agreements gave each representative, among other things, the authority to enter into agreements with third parties on behalf of the band. SUF 10.

### C. Record Company Agreements

Serrano entered into two agreements for Aliados De La Sierra with Mexican-based labels on behalf of the band: (1) a January 10, 2007 License Agreement between the band and Producciones Canales, S.A. de C.V. (the "Producciones Agreement"); and (2) a February 22, 2008 Artistic Interpretation Agreement between the band and American Show Latin, S.A. de C.V. (the "ASL Agreement"). SUF 11.

Pursuant to these agreements, record labels Producciones Canales and American Show Latin ("ASL") acquired the rights to the "Aliados De La Sierra"

---

[1] Serrano is not an employee, officer, director, or representative of UMG; he is not associated with UMG. SUF 6. He is a talent manager who identifies musical acts and brings them to record companies to sign deals. SUF 7.

name.  SUF 12.

On August 30, 2007, just three months before the release of the band's first album, Producciones Canales assigned its agreement to ASL.  SUF 13.

On February 21, 2009, UMG purchased ASL's assets.  SUF 14.  As part of this transaction, UMG acquired by assignment all of ASL's contracts including "all Recording Agreements."  SUF 15.  Explicitly listed in this assignment were all contracts between ASL and Aliados De La Sierra, "including, without limitation, all Recording Agreements . . . ."  SUF 16.

Aliados De La Sierra recorded eight albums while the band was together.  SUF 17.  The first album, Con Los Ojos Cerrados, was released on November 11, 2007.  SUF 18.  The last album, Coleccion Privada Las 20 Exclusivas, was released on November 22, 2010.  SUF 19.

### D. Trademark Application

On July 20, 2010, after the release of all but one of the Aliados De La Sierra albums, Diaz acquired a trademark in the name Aliados De La Sierra in Class 9 for "Pre-Recorded CDs Featuring Musical Compilations."  SUF 20.  To obtain this trademark, Diaz made numerous false statements to the PTO:

(1) That he used the mark in commerce in CDs (International Class 9) even though he admitted that he never manufactured, distributed or sold any CDs; SUF 21

(2) Represented that the album Con Los Ojos Cerrados was "the applicants cd recordings" even though he is not a musician and the CD was manufactured, distributed and sold by UMG; SUF 22

(3) Represented that the mark was first used on CDs on March 28, 2007, even though the first Aliados De La Sierra album was not released until November 11, 2007; SUF 23, and

(4) Represented that no one else had the right to use the Aliados De La Sierra name on recordings, even though he knew that UMG had the rights under

the two agreements described above.  SUF 24.

## III. LEGAL STANDARD

In ruling on this motion, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  To satisfy this standard, "all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Senger v. United States*, 103 F.3d 1437, 1440 (9th Cir. 1996).  As demonstrated below, the undisputed facts show that UMG is entitled to judgment as a matter of law.  Therefore, summary judgment is appropriate as to this counterclaim.

## IV. ARGUMENT

### A. This Court Can And Should Cancel Diaz's Trademark At The Summary Judgment Stage.

It is well established that in a federal district court "[a] party may seek cancellation of a registered trademark on the basis of fraud under 15 U.S.C. § 1064[(3)]." *Robi*, 918 F.2d at 1444.  A court "has authority to cancel a mark in whole or part." *Top Producer Sys. Inc. v. Software Sciences Ltd.*, No. 97–0415–MA, 1997 WL 723049, *2–3 (D. Or. July 21, 1997); *see* 15 U.S.C. §1119.

To cancel a trademark, there must be (1) a false representation regarding a material fact, (2) the registrant's knowledge or belief that the representation is false, (3) the intent to induce reliance upon the misrepresentation (4) reasonable reliance thereon, and (5) damages proximately resulting from the reliance. *Robi*, 918 F.2d at 1444.

This Court should cancel Diaz's trademark on summary judgment.  The Court can look to the Plaintiff's own admissions about the falsity of statements made to the PTO to cancel a trademark on summary judgment.  *Id.*  This Court can also "infer" from the evidence submitted by Diaz to the PTO that there was fraud. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1211 (11th Cir. 2008).

Upon examination, the undisputed evidence demonstrates that Diaz defrauded the PTO; and that Diaz would not have received his trademark but for these misrepresentations.

### B. The Submission of a Misleading Specimen to the PTO Constitutes Fraud.

Diaz submitted a misleading specimen to the PTO. He submitted the CD cover of the band's first album, "Con Los Ojos Cerrados," as evidence of his use of Class 9 goods in commerce. SUF 25. He further represented that "[s]pecimens are copies of the front and back covers of the *applicants cd recordings*." *Id.* (emphasis added). But for the submission of this specimen, Diaz would not have obtained a trademark in Class 9 for CDs. *See* PTO Rule §2.56.

There is no question that the CD was not "the applicants cd recordings." Indeed, Diaz admitted in discovery that he never recorded, manufactured, distributed or sold any Aliados De La Sierra CDs. SUF 26. Yet, Diaz's own attorney testified unequivocally that his client gave him this CD and told him it was Diaz's CD recordings. SUF 27.

The case law demonstrates that submission of a misleading specimen leads to the "inescapable" conclusion that fraud has occurred and the trademark must be cancelled. *Melodrama Pub., LLC v. Santiago*, No. 12 Civ. 7830(JSR), 2013 WL 1700929, *6 (S.D.N.Y. Apr. 11, 2013). In *Melodrama*, the court observed that "most damningly" the applicant submitted images of the covers of three books to the PTO as supposed examples of her own use of the mark, without ever mentioning that she had not written the books. *Id.* It cancelled the trademark at the pleadings stage on this basis alone. *Id.* at 7. The only difference between *Melodrama* and this case is that the false specimen is a CD rather than a book.

The Ninth Circuit's reasoning in *Robi* is also instructive. There the Ninth Circuit affirmed the cancellation of a trademark in the band name "The Platters" after the mark had been registered by a former manager of the band without the permission

of others with rights to the name. 918 F.2d at 1444. The Court found fraud in part because the plaintiff provided a "misleading exemplar" to the PTO about his role with the band. *Id.* This is exactly what Diaz, a former manager of Aliados De La Sierra, did here.

This false submission alone is enough to warrant the cancellation of Diaz's trademark.

### C. Failure To Inform The PTO Of The Established Rights Of Others To Use The Trademark Is Fraud.

Diaz submitted a false declaration to the PTO representing that he knew of no one else that had the right to use the Aliados De La Sierra name in commerce. SUF 28. This was another fraudulent statement.

UMG had the right to use the name on recordings under the ASL Agreement and Producciones Agreement. This right was explicitly stated in each agreement. The ASL Agreement provides:

> "JSM ***grants herein and hereby, a permanent, irrevocable and gratuitous license*** upon THE PRODUCER to use, even after expiration hereof and for the term set forth by the law, the producer right in favor of the PRODUCER, ***the artistic name of THE ARTISTS***, brands, copyrights, reserves of rights and other rights of intellectual property, in which it may be necessary or appropriate to use the artistic name of THE ARTISTS, ***with respect to any product recorded by ASL hereunder***.

SUF 29 (emphasis added).

The Producciones Agreement contains similar language. Serrano, again on behalf of Aliados De La Sierra, agreed to "***to deliver for exploitation purposes*** the first master of the recording, photographic session, ***logo***, credits and ***everything related for the commercialization***" to Producciones Canales. SUF 29 (emphasis added). The logo includes the Aliados De La Sierra name. SUF 20.

Diaz knew about these agreements when he submitted the false declaration on December 14, 2009. SUF 30 (admitting that he knew about the Producciones Agreement in January 2008). He further knew that the band had recorded and

6
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

released five albums under these agreements when he submitted the declaration. SUF 31. There is simply no other reason for Diaz's failure to inform the PTO about these agreements; except for fraud. Rather than telling the truth, Diaz informed his attorney that no one but himself had the right to use this name in Class 9 for recordings. SUF 32.

The Court should infer that Diaz fraudulently concealed this information from the PTO because he knew it would show the PTO that UMG had at least an equal right to use the mark. That's the inference the court made in *City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233, 242-43 (S.D.N.Y. 2010), when the court cancelled a trademark because the applicant neglected to submit an existing license agreement to the PTO.

The Ninth Circuit reached the same conclusion in *Robi*. The court found that the mark holder engaged in fraud by failing to inform the PTO that other persons had rights to use the name of the band. 918 F.2d at 1444; s*ee also Angel*, 522 F.3d at 1210-11 (affirming district court's cancellation of a trademark registration by inferring fraud from the applicant's failure to submit evidence of others' use).

### D. Diaz's False Statements About Using CDs In Commerce On Or Before March 28, 2007 Consitute Fraud.

Diaz also stated to the PTO that he was using CDs in commerce at least as early as March 28, 2007, almost eight months before the release of Aliados De La Sierra's first album. SUF 33. No CD had ever been used by anyone on March 28, 2007, a fact that Diaz knew when he submitted his application. SUF 34. Nevertheless, that's the date he chose to provide to his attorney:

> Q. [I]t states for international class 009 the mark was first used at least as early as 3-28-2007. Do you see that sir?
>
> A. Yes, sir.
>
> Q. And you obtained this information from your client, correct?
>
> A: Yes, sir.

*Id.*

Here, fraud can be inferred from the first date of use that Diaz chose. To get the trademark he sought in Class 9, Diaz had to provide a first date of use that predated UMG's first date of use. UMG's first date of use on CDs would have been around November 11, 2007, the release date of the first album. Thus, Diaz had to come up with an earlier date: March 28, 2007.

Courts have found false statements about the date of first use sufficient to cancel a trademark. For example, in *Tavern on the Green*, the court determined that there was fraud when the applicant knowingly misstated the first use in commerce date. 427 B.R. at 242-43. The facts are the same here and the same inference of fraud should be made.

Accordingly, this fraudulent statement is yet another ground for cancelling Diaz's trademark.

### E. Diaz's Fraudulent Statements About Using CDs In Commerce Present An Independent Ground For Cancelling A Mark.

Diaz represented to the PTO that he was using CDs in commerce with the mark on them. SUF 33. Yet it is undisputed that he has never used CDs in commerce at any time. SUF 31. This is yet another material fraudulent statement by Diaz. Diaz knew that he did not distribute or sell Aliados De La Sierra recordings when he submitted his application. Diaz would never have received a trademark in Class 9 if he had submitted truthful information on this point. *See Herbaceuticals, Inc. v. Xel Herbaceuticals,* 86 U.S.P.Q.2d 1572, 2008 WL 618625 *4 (TTAB 2008).

Furthermore, because Diaz has admitted in his deposition and interrogatory responses that he has never used CDs in commerce at any time, this Court should cancel Diaz's trademark even if it does not find his false statements about use in commerce to be fraudulent. SUF 35. Diaz's trademark was registered less than five years ago. Thus, under 15 U.S.C. § 1064(1), his trademark can be cancelled on any

ground that would have prevented the registration initially. *See Melodrama*, 2013 WL 1700929 at 4. Section 1064(1) of the Lanham Act only permits registration by "the owner of a trademark *used in commerce*." *See Melodrama*, 2013 WL 1700929 at 4 (emphasis added). Because Diaz unequivocally denied ever using the mark in commerce in Class 9, the mark should be cancelled on this ground as well. *See id.*

## V.  CONCLUSION

For the foregoing reasons, this Court should cancel Diaz's trademark and grant judgment in favor of UMG on its counterclaim.

DATED:  March 24, 2014                    Respectfully submitted,

                                                      MILLER BARONDESS, LLP

                                                      By:  */s/ A. Sasha Frid*
                                                            A. SASHA FRID
                                                            Attorneys for Defendants and Counterclaimants
                                                            UMG RECORDINGS, INC. and UNIVERSAL MUSIC GROUP DISTRIBUTION CORP